IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CALIFORNIA SELF-INSURERS'
SECURITY FUND, *et. al.*,

      **Appellants,**

v.

                                                   **Case No. 3:18cv619**

ALFRED SIEGEL, *Solely as Trustee*
*of the Circuit City Stores Liquidating Trust*
*and Not in Any Individual or Other Capacity,*

      **Appellee.**

## MEMORANDUM OPINION

This matter comes before the Court on Appellant California Self-Insurers' Security Fund[1]

(the "Fund") appeal from the August 27, 2018 Order of the Honorable Kevin R. Huennekens,

United States Bankruptcy Court Judge, granting summary judgment to Appellee Alfred Siegel

(the "Trustee"). (Bankr. Case No. 18-3040, ECF No. 1.) The Trustee filed a Response Brief,

(ECF No. 22), and the Fund replied, (ECF No. 23). The Fund also filed a motion requesting that

this Court "take judicial notice of certain pleadings and documents" in connection with the

Fund's opening brief on appeal (the "Motion for Judicial Notice"). (ECF No. 18.) The Trustee

responded to the Motion for Judicial Notice and did not object to this Court taking notice of the

orders and documents that the Fund attached to its motion. (Resp. 11, ECF No. 20.) The Fund

replied. (ECF No. 21.)

---

[1] The Court recognizes that the docket lists Appellants as "California Self-Insureds' Security Fund." The Court uses the title "California Self-Insurers' Security Fund" as set forth in the relevant statutes. *See, e.g.,* Cal. Lab. Code § 3740 (state legislature finding and declaring that "the establishment of the Self-Insurers' Security Fund is a necessary component of a complete system of workers' compensation"); Cal. Lab. Code § 3742 (establishing the Self-Insurers' Security Fund and governing board). The Court will order the Clerk of the Court to update the docket to show "Insurers'" in Appellant's name.

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. Accordingly, the matters are ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. § 158(a)(1).[2] For the reasons that follow, the Court will grant the Motion for Judicial Notice and affirm the judgment of the Bankruptcy Court.

## I. Factual and Procedural Background

This case concerns the scope of release provisions within a settlement agreement (the "Settlement Agreement") among the Fund, the Trustee, and the Director of the California Department of Industrial Relations. (ECF No. 11.) The Fund and the Trustee dispute whether the Settlement Agreement extinguished the Fund's ability to recover excess insurance proceeds from Old Republic Insurance Company ("ORIC") which the Trustee asserts are property of the bankruptcy estate. (R. 698.)[3] The Fund, the Trustee, and the Bankruptcy Court correctly agreed that California substantive law applies to this contract dispute.[4] (R. 763.)

### A.    The Fund Administers Circuit City's Outstanding Workers' Compensation Claims

Prior to filing for bankruptcy protection, national retailer Circuit City elected to self-insure its California workers' compensation obligations.[5] (R. 409.) In consenting to the election,

---

[2] "The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under [28 U.S.C. § 157] . . . ." 28 U.S.C. § 158(a)(1).

[3] The Court refers to the designated record, provided as a joint appendix, as "R." (ECF Nos. 19–2, 19–3, 19–4.)

[4] The Settlement Agreement contains a choice of law provision providing that California law shall govern. (*See* Settlement Agreement 4, ECF No. 11; R. 763.)

[5] In California, the Department of Industrial Relations administers the state's workers' compensation system. Cal. Lab. Code § 56. To ensure that injured workers receive compensation, California requires employers to either purchase workers' compensation

2

the California Department of Industrial Relations required Circuit City to post a letter of credit as collateral. (R. 409.) On July 1, 2008, Circuit City posted with the Office of Self-Insurance Plans an Irrevocable Standby Letter of Credit (the "Letter of Credit"), in the amount of $14,119,256. (R. 409.) In addition to posting the Letter of Credit, Circuit City obtained excess workers' compensation insurance from ORIC. (R. 175, 409.) In accordance with that policy, Circuit City would be responsible for the first $300,000 owed on any workers' compensation claim, and ORIC would be responsible for any loss more than that amount.[6] (R. 175, 410.)

On November 10, 2008, Circuit City filed for bankruptcy pursuant to Chapter 11, Title 11 of the United States Code. (R. 410.) The Bankruptcy Court authorized Circuit City to cease operations on January 16, 2009 and to liquidate its assets. (R. 758.) Circuit City incurred no obligation for workers' compensation after that date and cancelled its ORIC insurance policies on March 31, 2009. (Mot. Judicial Notice Ex. B. 25; ECF No. 18–2.)

Pursuant to California law, the Director of the California Department of Industrial Relations (the "Director") instructed the Fund to assume Circuit City's outstanding workers' compensation obligations. (R. 410.) The Director also assigned to the Fund the $14,119,256 Letter of Credit. (R. 410.) The Fund drew down the full amount of the Letter of Credit and

---

insurance from private insurance agencies or to self-insure, subject to a certificate of consent from the California Director of Industrial Relations. Cal. Lab. Code § 3700. Circuit City elected to cover workers' compensation claims up to $300,000 and purchased excess insurance from ORIC to cover any claim above that amount. (R. 409–10.)

[6] The Trustee asserts that ORIC continues to "cover [Circuit City's] excess insurance liability in various states and uses [Circuit City's] posted letters of credit (the 'ORIC Letters of Credit') to satisfy those obligations." (R. 8.) Circuit City posted a $36,020,048 letter of credit "as security for their obligation to [ORIC]." (Mot. Judicial Notice Ex. B. 27, ECF No. 18–2.)

began administering the outstanding workers' compensation claims.[7] (R. 410.) Thereafter, the Bankruptcy Court confirmed Circuit City's liquidating plan.

**B. The Fund, the Trustee, and the Director Enter Into a Settlement Agreement to Resolve Disputes Surrounding Certain Claims and the Letter of Credit Proceeds**

Roughly six years later, on December 23, 2015, the Trustee commenced in the Bankruptcy Court an adversary proceeding against the Director and the Fund to recover proceeds from the Letter of Credit that the Fund did not need to satisfy Circuit City's California workers' compensation obligations. (R. 413.) On April 26, 2016, the Bankruptcy Court ruled that any surplus proceeds from the Letter of Credit belonged to Circuit City's bankruptcy estate. (R. 413.) The Fund and the Trustee then disputed whether a surplus existed and, if so, the amount of surplus. (R. 413.)

To help determine the amount of the surplus, the Fund and the Trustee each obtained an expert. (R. 413.) In August 2016, the experts prepared their respective reports regarding the surplus amount, which the parties exchanged before negotiating the Settlement Agreement in September 2016. (R. 452, 519.) Both reports assumed excess insurance from ORIC remained valid and included figures summarizing the expected costs associated with settling remaining

---

[7] California regulations require a defaulting employer's excess insurer—in this case, ORIC—to submit monies directly to the Fund to pay the employer's obligations to California workers. Cal. Code Regs. tit. 8, § 15478(d). But the dispute here stems from the Trustee's adversary proceeding seeking excess proceeds of the Letter of Credit, which Circuit City posted, that are no longer needed to satisfy workers' compensation claims. *In re Circuit City Stores*, No. 08-35653-KRH, 2016 WL 1714515, at *7 (Bankr. E.D. Va. Apr. 26, 2016)) ("To the extent there are excess proceeds, the Trustee is entitled to those proceeds and nothing in the Bankruptcy Code or California law restricts that right.").

workers' compensation claims, listing net of excess insurance and gross unpaid liability on an

undiscounted basis.[8] (R. 460–61, 621–22, 670.)

Specifically, the Fund's expert valued the amount of the surplus between $2,291,504 and

$3,169,560 after utilizing different unallocated loss adjustment expense rates and recognizing the

---

[8] Although the expert reports provide many figures to estimate the surplus Letter of Credit proceeds after utilizing different discount rates and interest rates, the tables set forth below provide *examples* of the estimations included in the reports:

| Trustee's Expert Report (R. 458–61) | |
|---|---|
| Estimated Loss (including attorneys fees, court costs, expert witness fees) | 3,517,000 |
| Estimated Unallocated Loss Adjustment Expenses ("ULAE") (18% of gross reserves) | 633,000 |
| Estimated potential investment earnings | Range: 1,536,000—5,300,000 |
| Range of estimated loss *undiscounted and absent excess insurance* | Sum of first three rows: 5,686,000—9,450,000 |
| Estimated excess insurance | 2,425,000 |

| The Fund's Expert Report (R. 649, *see* R. 527, 648–49) Exhibit 3 Table 3. Circuit City Surplus Calculation as of 6/30/2016 ULAE Esc @ 1% | |
|---|---|
| Description | Amount |
| (A) Gross Payments Since Default | $9,244,585 |
| (B) Excess Insurance Recoveries | -$3,344,178 |
| (C) ULAE Paid Since Default | $2,037,772 |
| (D) Net Case Reserves | $1,112,272 |
| (E) Net Incurred But Not Reported | $806,345 |
| (F) ULAE Reserve @ 1% Escalation | $1,092,899 |
| (G) Total Cost to the Fund | Sum (A) through (F): $10,949,69[5] |
| (H) Collateral | $14,119,256 |
| (I) Excess of Collateral over Fund Costs | (G) minus (H): $3,169,56[1] |

existence of roughly $2.9 million in excess insurance. (R. 527, 623, 648–49). The Trustee's

expert valued the amount of the surplus at $4,460,000, recognizing the existence of roughly

$2,425,000 in excess insurance. (R. 458, 460–61.) The Trustee's expert further noted that the

amount of surplus "would substantially increase by including investment income and discounting

reserves . . . and could further increase if there are past [unallocated loss adjustment expense]

overcharges." (R. 458.) In the Trustee's expert report, investment income estimates ranged from

$1.5 million to $5.3 million after utilizing certain rates of return. (R. 467.) The Trustee's expert

affirmed that he had not "assessed the collectability of [Circuit City's] excess insurance."

(R. 469.) The Fund's expert similarly stated that "[a]n assessment of potential uncollectible

excess insurance is outside the scope of our assignment." (R. 622.)

Thereafter, in September 2016, the Fund, the Director, and the Trustee entered into the

Settlement Agreement to resolve "an adversary proceeding [in the Bankruptcy Court] entitled

*Alfred H. Siegel, Trustee v. California Self-Insurers' Security Fund, et al.*, Adversary Proceeding

No. 3:15-03477-KRH naming the Fund and the Director as defendants." (Settlement Agreement

2, ECF No. 11.) The parties agreed that they sought to

> amicably settle all claims, disputes, and causes of action they have and may have
> against each other related to, set forth in, or arising out of the Adversary
> Proceeding, the Proofs of Claim, the [Letter of Credit] Proceeds and all
> underlying facts, events and occurrences associated therewith, and any other
> aspect of their relationship and/or claims arising therefrom that exist or may have
> existed between them, on the terms and conditions as set forth herein.

(*Id.*) Pursuant to the Settlement Agreement, the Fund paid the Trustee $5.35 million,

representing surplus from from the Letter of Credit, and retained the remaining amount to satisfy

any continuing California workers' compensation claim obligations. (*Id.*) The Settlement

Agreement does not mention excess insurance, and the terms of the Agreement do not otherwise

explain how the parties reached that sum. (*Id.*)

The Settlement Agreement contained a mutual release, which states broadly:

In consideration of the obligations of *the Parties* set forth in this Agreement, and conditioned upon payment in full of the [Letter of Credit] Proceeds as described above, and the other agreements and obligations to be undertaken by each of the Parties as described herein, the Parties, for themselves, their officers, directors, members, shareholders, employees, beneficiaries, attorneys, successors in interest, and assigns, and anyone claiming by or through any of them, *do hereby release and forever discharge each of the other Parties and* their officers, directors, members, shareholders, employees, *beneficiaries,* attorneys, successors in interest, and assigns of and *from any and all claims,* counterclaims, cross-claims, third-party claims, causes of action, rights, debts, contracts, agreements, demands for payment or other relief, and any obligations of any nature, in law, equity or of an administrative nature, *whether now known or unknown,* and whether or not such claim is liquidated, or contingent, *from the beginning of time,* relating to or in connection with any matter described herein, including specifically but not limited to the Proofs of Claim, the [Letter of Credit], the Return of the [Letter of Credit] Proceeds, the Adversary Proceeding, *or arising out of the Parties' relationship in any way, shape or form whatsoever, and any and all other claims between the Parties,* except for breach or enforcement of this Agreement. Said release, as it pertains to the Director only applies to the dispute of *In re Circuit City Stores, Inc.,* Case No. 08-35653 (KRH) pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division regarding allegations related to Circuit City's self insured status. The release does not apply to any known or unknown claims the Director may have regarding other unrelated claims, including but not limited to claims involving the Director's regulatory authority over wage and hour and health and safety laws. The Trust reserves all rights to resist any and all potential claims of the Director that are excluded from this release, on grounds of timeliness, substance or otherwise.

(*Id.* 2–3) (emphases added). The Settlement Agreement also included a waiver of California

Civil Code § 1542,[9] providing that the release was complete notwithstanding any discovery or

the existence of additional facts that might have materially affected the decision to settle. (*Id.* 3.)

---

[9] That statute provides:

A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Cal. Civ. Code § 1542.

In early 2018, after entering the Settlement Agreement, the Fund made two demands upon ORIC for payment pursuant to the excess insurance policies. (R. 38.) The Fund received from ORIC $19,778.23 after making its first demand for payment, and $4,257.94 after making its second demand for payment. (R. 38.) The ORIC payments derived from open California workers' compensation claims, the same claims that were known to the Fund during settlement negotiations. (R. 11, 717–18.) The Fund's demands for payment from ORIC triggered the adversary proceeding underlying the current appeal. (R. 11–12.)

### C. The Trustee Initiates an Adversary Proceeding Against the Fund and the Director Seeking a Determination that the Settlement Agreement Released the Fund's Claims Against ORIC

After learning about the Fund's demands for payment against ORIC, the Trustee initiated the underlying adversary proceeding against the Fund and the Director seeking a determination that the Settlement Agreement released the Fund's claims against ORIC. (R. 11–12.) The Trustee moved for summary judgment, asserting that the unambiguous release provisions in the Settlement Agreement released ORIC. (R. 32–53.) The Trustee specifically requested a declaration that "by entering into the Settlement Agreement, the Fund released its right to seek reimbursement from ORIC on any of [Circuit City's] California workers' compensation claims, and the Fund is precluded from seeking further reimbursements from ORIC on account of [Circuit City's] California workers' compensation claims." (R. 52.) The Trustee sought damages equaling the reimbursements that ORIC had paid to the Fund after the Settlement Agreement went into effect because the Bankruptcy Court's previous ruling concluded that excess proceeds belonged to the bankruptcy estate. (R. 44, 52.) At issue was just over $14,000. (R. 4.)

8

The Fund opposed the Trustee's motion for summary judgment and asserted that, "standing in [Circuit City's] shoes, [the Fund] is empowered with the rights of [Circuity City] and is entitled to seek reimbursement for the amounts it expends on behalf of [Circuit City] to offset [the Fund's] costs." (R. 406.) The Fund further argued that it had not intended for the release in the Settlement Agreement to apply to ORIC. (R. 408, 414.) The Fund asserted that such intent becomes evident from reviewing the "plain meaning of the agreement, which never mentions ORIC; from the extrinsic evidence, admissible under California law; and from the parties' course of dealing." (R. 415.) The Fund also noted that "the Trust[ee] now claims that ORIC was released, [but the Trustee] admits in its motion that ORIC was never even informed of the settlement until a year after the fact." (R. 415.)

## D.     The Bankruptcy Court Awards Summary Judgment to the Trustee

The Bankruptcy Court held a hearing on the motion for summary judgment. (R. 696– 743.) During the hearing, Counsel for the Trustee explained how the parties reached the $5.35 million settlement figure, saying: first, the Trustee's expert valued the amount of the surplus, absent any excess insurance, at roughly two million dollars. (R. 710, *see* R. 461.) Next, Counsel for the Trustee noted that a discount rate should be applied, which amounted to roughly $500,000.[10] (R. 710.) Counsel for the Trustee also explained that "because the Fund had held this money for so many years," the Trustee sought interest or investment income dating back to 2009. (R. 710.) The investment income estimation, set forth in the Trustee's expert report, ranged from $1.5 million to $5 million dollars. (R. 710.) Counsel for the Trustee also

---

[10] The discount rate refers to computations of present value. *See, e.g., Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 n.21 (1983) (discussing arithmetic necessary for discounting). Because the Fund had held the money since 2009, roughly seven years before the Fund and the Trustee entered the Settlement Agreement, Counsel for the Trustee included this sum.

contemplated attorneys' fees in light of the ongoing disputes concerning the surplus proceeds. (R. 710.) Adding those amounts together produced "a range between four and a half and almost nine million dollars. And the [Trustee] settled for 5.35 million dollars." (R. 710–11.)

In response, the Fund argued that "excess insurance was not the subject of the prior adversary proceeding" and that the expert reports showed that both parties intended to "net out excess recoveries" those recoveries exceeding $300,000, because that money would be "recovered from another source," namely ORIC. (R. 715.) As a result, the Fund contended that "there was agreement among their experts that, when you calculate the net case reserves, which is part of that surplus calculation, you take out of consideration excess-insurance reimbursements." (R. 716.) The Bankruptcy Court then questioned Counsel for the Fund about whether the Settlement Agreement fully extinguished the Fund's remaining liability to the Trustee derived from the workers' compensation claims. (R. 719.) Counsel agreed that the Fund could get reimbursed only to the extent that Circuit City has liability, but asserted that the Fund "didn't waive [its] right to seek reimbursement from ORIC." (R. 719.) Because the Fund agreed to release "all obligations of any nature against Circuit City," the Bankruptcy Court stated that the Fund could not seek further reimbursements from ORIC. (R. 719–20.)

Counsel for the Fund also argued that if the Trustee's intent was to "wrap everything up, including excess," then the parties should have discussed that during settlement negotiations and made different calculations accounting for such an intent. (R. 729–30.) Counsel for the Fund asserted that "this settlement came together over a Labor Day weekend," there was no reference to this during settlement, and the release language is boilerplate. (R. 728.) Counsel for the Fund further argued that the "best evidence" of its intent to always look to ORIC "as an insurer for

recovery on the excess" were the expert reports the parties prepared.[11] (R. 728.) To counter the Fund's reliance on the surplus figures provided in the expert reports, the Trustee argued that the expert reports "were only one piece of the puzzle" and nothing in those reports "would lead to a thought that there's any ambiguity in the plain language of the agreement or that the carving out of this ability of the fund to pursue the excess carrier is reasonably susceptible to that kind of rewrite." (R. 711.)

The Bankruptcy Court awarded summary judgment to the Trustee. (R. 740.) The Bankruptcy Court first determined that the "only dispute in this case is whether the release provision included in the Settlement Agreement appl[y] to the self-insurance obligations of [Circuit City] that are insured by ORIC." (R. 762.) To resolve that dispute, the Bankruptcy Court examined the terms of the Settlement Agreement. The Bankruptcy Court found the Settlement Agreement to be "facially unambiguous." (R. 763.) But because the Trustee and the Fund disagreed over the meaning of the release provisions in the Settlement Agreement, the Bankruptcy Court, in accordance with California law, engaged in a two-step inquiry to determine whether the release was ambiguous. (R. 763.)

For the first step, the Bankruptcy Court considered "any proffered extrinsic evidence which is relevant to show whether the contract is *reasonably* susceptible of a particular meaning." (R. 763–64.) The Bankruptcy Court found that the Fund's proffered extrinsic evidence did "not make the release provision susceptible of the meaning advanced by the Fund, but rather flatly contradict[ed] the express terms of the Settlement Agreement." (R. 764.) Because the Bankruptcy Court found that the extrinsic evidence did not make the contract

---

[11] Counsel for the Fund also contended that ORIC's decision to pay the claims supported its position. (R. 414, 418–19, 732.) In response, Counsel for the Trustee noted that ORIC had not received a copy of the Settlement Agreement when it paid the Fund. (R. 44 n.4, 735.)

"reasonably susceptible" to the meanings the Fund proposed, the Bankruptcy Court did not proceed to the second step and admit the extrinsic evidence to use it in aid of interpreting the Settlement Agreement. (R. 764.)

The Bankruptcy Court supported its conclusion further by noting that the Settlement Agreement released Circuit City's obligation to pay any monies to the Fund for claims that exceeded the $300,000 threshold. (R. 758.) Because Circuit City would no longer pay workers' compensation claims necessary to trigger the ORIC policy, the Fund had "no mechanism by which to seek recovery from the ORIC excess insurance." (R. 766.)

The Bankruptcy Court also observed that the release provision in the Settlement Agreement explicitly released all "beneficiaries." (R. 766.) As ORIC continued to hold letters of credit on which to draw payments for various workers' compensation claims against Circuit City, the Bankruptcy Court considered ORIC a beneficiary under the terms of the Settlement Agreement. (R. 767.) Lastly, the Bankruptcy Court noted that the Settlement Agreement included a carve-out provision for the Director in certain instances but included no such carve-out for excess insurance policies or ORIC.[12] (R. 767.) Because able counsel represented the Fund during settlement negotiations, the Bankruptcy Court rejected the Fund's purported subjective intent (claiming that the Fund did not intend to release its claims against ORIC) and concluded that the "Settlement Agreement released any and all claims of the Fund against the Trust[ee], including but not limited to any claims against ORIC." (R. 768.) The Fund timely appealed. (R. 846, 851.)

_____

[12] The release provision expressly carved out "any known or unknown claims the Director may have regarding other unrelated claims, including but not limited to claims involving the Director's regulatory authority over wage and hour and health and safety laws." (Settlement Agreement 3.)

The Fund raises several issues on appeal challenging the Bankruptcy Court's award of summary judgment to the Trustee. (Appellant's Br. 3–4, ECF No. 19.) The Fund argues that the Bankruptcy Court erred when it determined that "'[t]he only dispute in this case is whether the release provision included in the Settlement Agreement applies to the self-insurance obligations of [Circuit City] that are insured by ORIC.'" (Appellant's Br. 3.) The Fund contends that the Bankruptcy Court failed to admit or fully analyze the extrinsic evidence that the Fund offered to oppose the Trustee's motion for summary judgment. (Appellant's Br. 3.) The Fund asserts that the "Bankruptcy Court erred in finding that the extrinsic evidence offered by the Fund 'flatly contradicts the express terms of the Settlement Agreement,'" (Appellant's Br. 4), and in "finding that 'the Settlement Agreement effectively eliminated the Fund's ability to collect against ORIC,'" (Appellant's Br. 4). The Fund maintains that the Bankruptcy Court erred in finding that a release of Circuit City's obligations to the Fund released ORIC's obligations to the Fund. (Appellant's Br. 4.) It contests the Bankruptcy Court deeming ORIC a "beneficiary" for purposes of the Settlement Agreement. (Appellant's Br. 4.) Lastly, the Fund argues the Bankruptcy Court erred in denying the Fund's request to conduct discovery. (Appellant's Br. 4.)

## II. Applicable Legal Standards

### A. Standard of Review: The District Court Functions as an Appellate Court for Bankruptcy Cases

Final orders of a bankruptcy court are appealable to a district court pursuant to 28 U.S.C. § 158(a). "When reviewing a decision of the bankruptcy court, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal." *Paramount Home Entm't Inc. v. Circuit City Stores, Inc.*, 445 B.R. 521, 526–27 (E.D. Va. 2010) (citing *Webb v. Reserve Life Ins.* (*In re Webb*), 954 F.2d 1102, 1103–04 (5th Cir. 1992)). The district court reviews the bankruptcy court's legal conclusions *de novo* and its factual findings

13

for clear error. *Stancill v. Harford Sands, Inc. (In re Harford Sands Inc.)*, 372 F.3d 637, 639 (4th Cir. 2004). A finding of fact is clearly erroneous if a court reviewing it, considering all of the evidence, "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)); *accord Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 324 (4th Cir. 2008) (quoting *United States Gypsum Co.*, 333 U.S. at 395). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. In cases where the issues present mixed questions of law and fact, the Court will apply the clearly erroneous standard to the factual portion of the inquiry and *de novo* review to the legal conclusions derived from those facts. *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996). "Decisions committed to the discretion of the bankruptcy court are reviewed for abuse of discretion." *In re Mitrano*, 409 B.R. 812, 815 (E.D. Va. 2009).

## B. California Law Requires a Two-Step Inquiry to Determine Whether the Court May Admit Extrinsic Evidence to Interpret a Written Agreement

The Fund and the Trustee agree that, as set forth in the terms of the Settlement Agreement, California law controls the analysis. (Settlement Agreement 4.) Pursuant to California law, the Court must interpret the Settlement Agreement using the same principles applicable to any other contractual agreement. *Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Cal. Ct. App. 1992). California statutes direct that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Cal. Civ. Code § 1625; *see also* Cal. Civ. Proc. Code § 1856 (codifying parol evidence rule—precluding evidence of a prior agreement or contemporaneous oral agreement to contradict terms included in a written

14

instrument that the parties intend as their final expression—but allowing parol evidence to explain an extrinsic ambiguity or otherwise interpret the terms of an agreement).

Furthermore, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." Cal. Civ. Code § 1639. "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." Cal. Civ. Code § 1647. "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Cal. Civ. Code § 1649.

California case law further explains when a court may consider extrinsic evidence to interpret a written contract. *See, e.g., Winet*, 6 Cal. Rptr. 2d at 557 (stating that when contract is ambiguous, court may properly admit parol evidence to construe the written agreement). To determine whether such evidence may be admitted, California law requires courts to "follow a two-step process to determine the admissibility of extrinsic evidence to interpret a written agreement." *Blumenfeld v. R. H. Macy & Co.*, 154 Cal. Rptr. 652, 655 (Cal. Ct. App. 1979).

> First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions *to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party.* If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract.

*Winet*, 6 Cal. Rptr. 2d at 557 (emphasis added). "On the other hand, if the court decides in light of this extrinsic evidence that the contract is not reasonably susceptible to the offered

interpretation, then the evidence is inadmissible to interpret the contract." *Blumenfeld*, 154 Cal. Rptr. at 655–56.

The first step presents a question of law, not of fact. *Madison v. Superior Ct.*, 203 Cal. Rptr. 299, 304 (Cal. Ct. App. 1988). Accordingly, this Court reviews de novo the Bankruptcy Court's threshold determination of ambiguity. *Winet*, 6 Cal. Rptr. 2d at 557. To be sure, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968). And "testimony by the releasing party regarding who he thought he was releasing . . . does not determine the legal effect of the release." *Neverkovec v. Fredericks*, 87 Cal. Rptr. 2d 856, 867 (Cal. Ct. App. 1999). Rather, California law dictates that the court must consider how a reasonable person would view the other party's understanding of the release. Cal. Civ. Code § 1649; *id.*

## III. Analysis

The Court will first consider the Fund's Motion for Judicial Notice. The Court will then consider the extrinsic evidence that the Fund proffered in conjunction with the Settlement Agreement to determine whether the Bankruptcy Court erred when it awarded summary judgment to the Trustee.

### A.     The Court Will Grant the Motion for Judicial Notice

The Court turns first to the Fund's Motion for Judicial Notice. Rule 201(b) of the Federal Rules of Evidence permits a court to take judicial notice of an adjudicative fact that is "not subject to reasonable dispute" because it "(1) is generally known within the trial court's

territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The rule further requires that the Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

The Fund attached to its Motion for Judicial Notice seven documents: (1) the September 14, 2010 Findings of Fact, Conclusions of Law, and Order Confirming Liquidating Plan, *In re Circuit City Stores, Inc., et al.*, 2008-bk-35653-KRH, ECF No. 8555; (2) the March 30, 2010 Notice of Proposed Settlement Agreement and Stipulation by and Between Circuit City and ORIC, *In re Circuit City Stores, Inc., et al.*, 2008-bk-35653-KRH, ECF No. 7032; (3) the February 25, 2011 Liquidating Trust's Sixth Omnibus Objection to Claims, *In re Circuit City Stores, Inc., et al.*, 2008-bk-35653-KRH, ECF No. 10043; (4) the June 13, 2011 Order Sustaining Liquidating Trust's Sixth Omnibus Objection to Claims, *In re Circuit City Stores, Inc., et al.*, 2008-bk-35653-KRH, ECF No. 10862; (5) the October 21, 2011 Liquidating Trust's Twenty-Third Omnibus Objection to Claims, *In re Circuit City Stores, Inc., et al.*, 2008-bk-35653-KRH, ECF No. 11388; (6) the January 13, 2012 Order Sustaining Liquidating Trust's Twenty-Third Omnibus Objection to Claims, *In re Circuit City Stores, Inc., et al.*, 2008-bk-35653-KRH, ECF No. 11654; and, (7) the August 8, 2017 Order Directing Withdrawal of Claims, *In re Circuit City Stores, Inc., et al.*, 2008-bk-35653-KRH, ECF No. 14117. The Court finds that these documents are public records and constitute appropriate subjects of judicial notice. The Trustee does not oppose the Court taking judicial notice of these records. Accordingly, the Court will grant the Motion for Judicial Notice.

## B. The Bankruptcy Court Properly Awarded Summary Judgment to the Trustee

Having decided the Motion for Judicial Notice, the Court turns to the instant appeal.

Reviewing *de novo* the terms of the Settlement Agreement, the Court first concludes, as did the

Bankruptcy Court, that the Settlement Agreement "is facially unambiguous."[13] (R. 763.)

Additionally, after reviewing the extrinsic evidence proffered, the Court further concludes that

the Settlement Agreement is not reasonably susceptible to the Fund's offered interpretation (that

the Fund did not intend to release its claims against ORIC for excess workers' compensation

insurance). As a result, the Court agrees with the Bankruptcy Court that the Settlement

Agreement is not ambiguous. (R. 763–64.) Accordingly, the Court deems inadmissible the

proffered evidence and will affirm the Bankruptcy Court's award of summary judgment to the

Trustee.

### 1. The Proffered Extrinsic Evidence Does Not Make the Release Provision Susceptible to the Meaning Advanced by the Fund

The Court has no difficulty concluding, as did the Bankruptcy Court, that the broad

release provisions in the Settlement Agreement are not reasonably susceptible to the

interpretation placed upon it by the Fund. The Court does not find convincing the Fund's

argument to the contrary, that it never intended to release ORIC because the amount it paid to the

Trustee would otherwise "make no sense." (Appellant's Br. 32–35.) Although the expert reports

explained that, *prior* to the Settlement Agreement, the Fund may be able to collect excess

insurance payments, that calculation changed when the Fund and the Trustee released in the

Settlement Agreement all claims "arising out of the Parties' relationship in any way, shape, or

---

[13] On appeal, the Fund does not challenge the Bankruptcy Court's initial finding that "the Settlement Agreement in the case at bar is facially unambiguous." (*See* R. 763.) Rather, the Fund contends that because the Settlement Agreement "could be construed as reasonably susceptible to the interpretation urged by the Trustee, it is ambiguous." (Appellant's Br. at 17.)

form whatsoever." (Settlement Agreement 3.) Indeed, the expert reports stated that they did not assess the collectability of any excess insurance, and the Settlement Agreement could certainly alter that computation by resolving liability stemming from the workers' compensation claims. Simply because "the parties exchanged expert reports that estimated the amount of surplus collateral that could be returned to the Trust based upon what would actually be due back to the Trust after the Fund was reimbursed by the excess carrier," (Appellant's Br. 32), does not mean that the figures contained in those reports negate the broadly-worded release provisions that the Fund agreed to when it entered the Settlement Agreement. (*See* Settlement Agreement 3; R. 458–61, 527, 648–49.)

Moreover, the expert reports, on which the Fund relies for its argument concerning extrinsic evidence, presented different ranges of surplus proceeds and related investment income. The $5.35 million settlement, while perhaps more favorable to the Trustee, was not out of the range of financial possibilities to settle claims "arising out of the Parties' relationship in any way, shape or form whatsoever," stemming from the Letter of Credit surplus proceeds.[14] The Trustee's expert report recognized a $2 million surplus absent excess insurance, without accounting for the discount rate and potential investment income. As Counsel for the Trustee explained during the hearing before the Bankruptcy Court, the amount the parties agreed to in the Settlement Agreement fell well within the ranges contemplated by the parties for the surplus proceeds and related monies.[15]

---

[14] The excess insurance proceeds arise in "some way, shape, or form" from the relationship of the parties, (Settlement Agreement 3) *i.e.*, between the Trustee, in Circuit City's capacity as Debtor, and the Fund, in Circuit City's capacity as a former employer with workers' compensation obligations.

[15] Counsel for the Trustee also rightly observed that adding together the relevant amounts produced a range between four and a half to almost nine million dollars. (R. 711.)

19

Furthermore, the Bankruptcy Court had already determined, in 2016, that surplus proceeds belonged to the bankruptcy estate. Based on this conclusion, to the extent a surplus existed, the Fund and ORIC held money that belonged to Circuit City's bankruptcy estate. The Fund and the Trustee subsequently agreed to settle any dispute concerning the surplus proceeds and expressly waived California Civil Code § 1542, releasing any known or unknown claims that "would have materially affected his or her settlement with the debtor or released party." In doing so, the Fund released its claims against Circuit City vis-a-vis the Trustee, and any related demands for payment against ORIC.[16]

The Fund also argues that "the fact that the Trustee did not apprise ORIC that it had been released under the Settlement Agreement is compelling evidence that the Trustee did not believe ORIC had been released and is *per se* admissible to interpret the agreement under California law." (Reply Br. 19, ECF No. 23.) But this argument also fails. First, California law makes clear that the evidence is not *per se* admissible. *See, e.g., Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n.*, 291 P.3d 316, 318–19 (Cal. 2013) (discussing parol evidence rule, observing that written terms supersede statements made during the negotiations and "[e]xtrinsic evidence of the agreement's terms is thus irrelevant, and cannot be relied upon"). Rather, the court may consider it to determine "ambiguity," *i.e.*, whether the language is

---

[16] California's statutory scheme regarding workers' compensation self-insurance does not eliminate the Fund's ability to settle payment of such claims. (Appellant's Br. 35–37.) California law recognizes a good faith duty to settle claims. *See Jonathan Neil & Assoc., Inc. v. Jones*, 94 P.3d 1055, 1068 (Cal. 2004), as modified (Oct. 20, 2004) ("We [have] held that the insurer, when determining whether to settle a claim, must give at least as much consideration to the welfare of its insured as it gives to its own interests."); *Murphy v. Allstate Ins. Co.*, 553 P.2d 584, 586 (Cal. 1976) ("The duty to settle is implied in law to protect the insured from exposure to liability in excess of coverage as a result of the insurer's gamble—on which only the insured might lose."). "And in some circumstances, this means an obligation to investigate claims properly and discharge them without delay." *Sec. Officers Serv., Inc. v. State Comp. Ins. Fund*, 21 Cal. Rptr. 2d 653, 657 (Cal. Ct. App. 1993).

20

"reasonably susceptible" to the interpretation urged by a party. *See Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006) ("'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'") (quoting *Pacific Gas & E. Co.*, 442 P.2d at 641)).

Second, after considering this evidence, the Court finds that ORIC's lack of knowledge about the confidential Settlement Agreement does not make the release provisions reasonably susceptible to the Fund's interpretation. Neither the Trustee nor the Fund communicated with ORIC about the Settlement Agreement, presumably because the Trustee believed all claims were resolved and the matter closed. But when the Trustee learned about ORIC's payments to the Fund, the Trustee promptly asked ORIC to stop payments and sought enforcement of the Settlement Agreement through the underlying adversary proceeding. Such extrinsic evidence does not tend to show that the Trustee understood that the Settlement Agreement failed to release ORIC.

In sum, the extrinsic evidence that the Fund proffered does not make the Settlement Agreement reasonably susceptible to the Fund's interpretation that it did not intend to extinguish any demands for payment against ORIC, which provided excess insurance for Circuit City, when the Fund resolved and released "all claims arising out of the Parties' relationship in any way, shape, or form whatsoever" against the Trustee. (Settlement Agreement 3.) After considering the evidence proffered, because the Court finds that the Settlement Agreement is not "reasonably susceptible" to the interpretation urged by the Fund, the Court finds the evidence proffered inadmissible to construe the terms of the Settlement Agreement.

## 2. The Bankruptcy Court Did Not Fundamentally Mischaracterize the Dispute Because it Considered ORIC a Beneficiary

The Fund contends that the Bankruptcy Court mischaracterized the case by focusing on the release provisions in the Settlement Agreement and that the central issue here "is whether ORIC is an intended third party beneficiary of the Settlement Agreement." (Appellant's Br. 18.) The Fund argues that "ORIC has never been entitled to distribution of any sort under" Circuit City's liquidating plan, (Mot. Judicial Notice 10), therefore the Bankruptcy Court erred when it deemed ORIC a beneficiary for purposes of the Settlement Agreement. The Fund goes to great lengths to define the term beneficiary through other documents and references outside the terms of the Settlement Agreement. (Appellant's Br. 24–30; Mot. Judicial Notice 8–10.) The Fund's argument over the term "beneficiary" misses the mark.

The use of the term "beneficiary" in the Settlement Agreement does not require the Court to define ORIC as an "intended third-party beneficiary." Indeed, the Bankruptcy Court recognized that the Settlement Agreement did not define the term "beneficiary" and explained how ORIC can be perceived as a beneficiary under the broad terms of the Settlement Agreement and ORIC's relationship to the Fund. (R. 766–67) (recognizing Black's Law Dictionary commonly defines "beneficiary" as someone "entitled under a letter of credit to draw or demand payment"). *See also See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Servs. Grp.*, 89 Cal. Rptr. 3d 473, 484–85 (Cal. Ct. App. 2009) (discussing third-party beneficiaries in excess insurance context, finding insurer could sue workers' compensation program administrator for breach of contract as third-party beneficiary to the administration contract because the administrator's duties to resolve claims directly benefitted insurer). Similar to the Bankruptcy Court, this Court concludes that the Settlement Agreement does not qualify the use of "beneficiary" to suggest that it encompassed only intended third-party beneficiaries.

Relatedly, the Fund cites *Neverkovec v. Fredericks*, 87 Cal. Rptr. 2d 856 (Cal. Ct. App. 1999), and relies on its progeny, *Vahle v. Barwick*, 113 Cal. Rptr. 2d 793 (Cal Ct. App. 2001), to argue that the failure to name an intended third-party beneficiary creates a triable issue of fact and that the Bankruptcy Court erred when it granted summary judgment before allowing discovery here. (Appellant's Br. 18–22.) But the California appellate courts found in both *Neverkovec* and *Vahle* that *terms within the contract* raised a triable issue of fact regarding the parties' intent to release certain third-parties.[17] *See Neverkovec*, 87 Cal. Rptr. 2d at 868 (examining the ambiguity of the release itself, which included the "curious" provision allowing for the repayment of future claims); *see also Vahle*, 113 Cal. Rptr. 2d at 793 (recognizing that while the release agreement did not name the third-party defendant attorney, the agreement settled only the claims of the litigants, not future attorney malpractice claims). Here, there are no contradictory terms within the Settlement Agreement regarding the release of claims among the Fund, the Trustee, and the Director. In sum, the Fund's argument concerning ORIC's status as a beneficiary fails and the Bankruptcy Court did not err when it focused on the terms of the Settlement Agreement.

## IV. Conclusion

The Fund cannot escape the broadly-worded release provisions to which it agreed by arguing that the Settlement Agreement precludes it from seeking payments from ORIC only if ORIC qualifies as a beneficiary. The Trustee, as successor to Circuit City, settled all remaining liability with the Fund, which administered Circuit City's California workers' compensation

---

[17] Moreover, the concurring opinion in *Neverkovec* expressly cautioned against allowing a party to introduce evidence concerning his or her own subjective intent. *Neverkovec*, 355, 87 Cal. Rptr. 2d at 870 (Walker, J. concurring); *see also Garcia v. Truck Ins. Exch.*, 682 P.2d 1100, 1107 (Cal. 1984) (Mosk, J., and Bird, C.J., concurring) ("To allow an attorney to give his obviously self-serving opinion of what the parties had in mind when they negotiated for the policy does violence to the unambiguous code section.").

23

claims. Because surplus proceeds belong to the bankruptcy estate and the parties agreed to release all claims arising out of their relationship in "any way, shape, or form whatsoever," the Fund may not continue to demand payments from ORIC for Circuit City's California workers' compensation claims under the terms of the Settlement Agreement. The Court will affirm the judgment of the Bankruptcy Court.

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: September 27, 2019
Richmond, Virginia